UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARRETT GRIFFIN,<br>  Plaintiff,<br><br>  v.<br><br>DEPARTMENT OF MENTAL HEALTH<br>AND ADDICTION SERVICES,<br>  Defendant. | No. 3:09cv1002 (SRU) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

The defendant, the Connecticut Department of Mental Health and Addiction Services ("DMHAS"), moves for summary judgment on the plaintiff's claims of race discrimination and retaliation brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* Because the plaintiff has failed to submit evidence establishing a genuine issue of material fact regarding DMHAS's discrimination and retaliation against him, DMHAS is entitled to summary judgment on the plaintiff's claims.

### I. Background

The following facts are undisputed unless otherwise noted. The plaintiff, Garrett Griffin, was employed by DMHAS from September 1992 until September 29, 2008, when he received a letter of termination. During the time of his employment, Griffin worked as a police officer for DMHAS, ultimately rising to the rank of sergeant. From the record, it appears that Griffin provided security in more than one of DMHAS's facilities over the course of his employment.

On June 29, 2007, Griffin received a hand-delivered memorandum from Paula DeBarros, a labor relations officer, regarding a Loudermill hearing scheduled for July 3, 2007. The letter informed Griffin that DMHAS had performed an investigation of several workplace incidents

involving him, and that the hearing was ordered in order for DMHAS to take disciplinary action.

DMHAS's investigation revealed that Griffin had been involved in the following infractions:

- On April 11, 2007, Lieutenant Ricardo Torres wrote a violation report that Griffin had changed information on an incident report regarding an "AWOL" (absent without official leave) patient. According to Torres, Griffin had changed the time that the incident occurred. In his written response to the violation report, however, Griffin maintained that his subordinate officer put the wrong time into the incident report and Griffin made the change as a correction. Def. Ex. 8, Violation Rpt. # 943; Def. Ex. 1 at 94.

- On April 11, 2007, Lieutenant Torres wrote a violation report that, on March 29, 2007, Griffin failed to place two AWOL clients "on the NCIC teletype," file a case report regarding the AWOL clients, and contact the Department of Social Services that the clients were missing and "dangerous to self and others." When Torres directly instructed Griffin to perform those tasks, Griffin did not complete them within the set deadline. Griffin claimed that he had asked another officer to put the clients on the NCIC teletype, but admitted to the rest of Lieutenant Torres's charges. Def. Ex. 8, Violation Rpt. # 944.

- On May 30, 2007, Lieutenant Torres wrote a violation report that, on May 18, 2007, a mental health assistant reported to Griffin that she wanted to press charges against a client who continually threatened her with bodily harm. Griffin never took the steps to press charges, but only filed an incident report. The mental health assistant complained to Torres on May 28, 2007 that no charges had been filed against the client. Griffin admitted that he did nothing more than file the incident report even though he "believe[d] that there [was] a violation of the penal code." In his written statement to the violation report, Griffin accepted responsibility for his actions. Def. Ex. 8, Violation Rpt. # 1095. At his deposition, however, he claimed that the mental health assistant's complaint was not serious — according to him, the complainant could "whoop [the client's] behind any day" — and Torres knew that, too. Pl. Ex. 2 at 100. Griffin gave no such account in his written statement, however.

- On May 30, 2007, Lieutenant Torres filed another report against Griffin for failing to press charges. That report concerned an assault of one patient by another patient on May 19, 2007; on May 22, 2007, the victim's conservator told Griffin that he wanted to press charges against the assailant, but Griffin took no actions to pursue the charges. In his written statement in response to the violation report, Griffin admitted that he never took a statement from the victim's conservator and that when he entered his report regarding the conversation, he negligently entered it as an incident of "assist citizen" rather than "assault," although at his deposition he testified that the label was intentional and reflected that the assault was not verified. Pl. Ex. 2 at 106. Griffin admitted, too, that he "did not follow the protocol of filing criminal charges" and that he did not "have a reason for not doing my job." Def. Ex. 8, Violation Rpt. # 1096.

On July 9, 2007, before his Loudermill hearing, Griffin filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that DMHAS retaliated against Griffin and discriminated against him on the basis of his race, age, and perceived disabilities. Def. Ex. 5 ¶ 39 (incorrectly marked as paragraph 38). Griffin is an African-American man, was 51 years old when he filed the CHRO complaint, and purportedly suffers from "actual disabilities of heart, hypertension, and . . . diabetes." *Id.* On July 17, 2007, following his Loudermill hearing, DMHAS notified Griffin by letter that he was being suspended for ten working days "for repeated violations" of DMHAS's work rules and state regulations. Def. Ex. 13. That letter continued:

> By your own admission, on several occasions you repeatedly neglected your duty by not following proper police protocol involving AWOL's, reports of assaults and threats, not completing the necessary police reports in a timely fashion, not notifying the required entities in a timely fashion after certain incidents like AWOL's were reported directly to you and not carrying out the Lieutenant and Captain's orders to complete your work in a timely fashion even after numerous reminders were given for you to do so.

*Id.* On July 23, 2007, DMHAS received notice from CHRO regarding Griffin's complaint. *See* Def. Ex. 15 at 1.

On April 1, 2008, Griffin was suspended again for similar incidents occurring between July 2007 and October 2007. According to the letter, the DMHAS's investigation:

> [R]evealed that [Griffin] repeatedly neglected [his] duty by: not following proper police protocol involving motor vehicle stops; failing to complete the necessary police reports in a timely fashion; not carrying out the Lieutenant and Captain's orders to complete [his] work in a timely fashion even after numerous reminders were given for [him] to do so and; jeopardizing the safety of staff and patients.

Def. Ex. 29. The letter concluded by stating that "this letter serves as a Final Warning to [Griffin] that immediate improvement will need to be noticed in the deficient areas described

above. Further violation of State Personnel Regulations Sec. 5-240-1a will result in dismissal of State service." *Id.* Griffin's second suspension lasted 15 working days.

DMHAS ordered Griffin's second suspension while his CHRO complaint was still pending. Moreover, it appears from the record that Griffin grieved each of his two suspensions. On June 12, 2008, DMHAS entered into a stipulation with Griffin. DMHAS agreed to reduce Griffin's first suspension by five days and his second suspension by six days, and to reimburse Griffin for those days. Def. Ex. 10 ¶¶ 1-3. In exchange, Griffin agreed to waive his grievances and his CHRO complaint. *Id.* ¶ 5.

In August 2008, Griffin was involved in two more disciplinary incidents. According to a DMHAS report, on August 8, 2008, Griffin had pressured Robert Sonido, a DMHAS officer under Griffin's supervision, to dissuade Sonido's wife, who was also employed by DMHAS, from reporting on Griffin's dereliction at work. Griffin believed Sonido's wife had complained to a lieutenant that, without alerting anyone, Griffin left his work station to get coffee and, separately, to watch television in another office. Griffin told Sonido that his wife should mind her own business and implied that he would retaliate against Sonido for his wife's alleged tattling. In his written statement included in the violation report, Griffin admitted that he spoke with Sonido about his wife, but stated that "it was not [his] intent to intimidate BGPO Sonido." Rather, Griffin only meant to "make him aware of his wife's actions." Def. Ex. 19.

The second incident occurred on August 12, 2008. That night at the Greater Bridgeport Community Mental Health Center ("GBCMHC"),[1] a drunk and disorderly man was refused admission to detox. The man was accompanied by two women, who were later revealed to be

---

[1] The record is unclear whether Griffin was stationed only at GBCMHC during the relevant periods of this lawsuit. The complaint says that Griffin also served at Cedarcrest Hospital in Newington and Southwest Connecticut Mental Hospital in Bridgeport. Cmplt. ¶ 6.

his wife and mother-in-law. When the man was rejected from detox, he engaged in a physical fight with his mother-in-law and threatened his wife in GBCMHC's reception area. Officer Luis Velez was on duty and responded to the altercation; upon seeing the man physically attack his mother-in-law, he radioed Griffin for backup. Griffin never responded to the repeated radio calls for assistance, and Velez was left to subdue the man by himself. Griffin arrived once the man was subdued and assisted Velez in handcuffing him. Griffin instructed Velez to charge the man with breach of the peace but only issue a summons rather than perform a custodial arrest. Griffin also ordered that the man be committed to a hospital on an emergency basis. Velez replied that the man had to be charged with domestic violence. According to Velez, Griffin was his superior, but was unsure regarding the proper protocol to apply.

Griffin then called his supervisor, Lieutenant Miner, to explain what occurred.[2] Miner asked to speak with Velez, the responding officer, who informed her of the charges brought against the man. Later that evening, Velez spoke with Miner again; during that conversation, Miner ordered that the man be arrested for domestic violence, and confirmed that he should not have been issued a summons for breach of the peace. The next morning, Miner checked with Griffin regarding the man's status. Under DMHAS policy, the man had to be taken before a judge within 24 hours if he were arrested for domestic violence. To initiate that process, DMHAS police had to forward arrest paperwork to the court. Griffin, however, did not complete that paperwork and send it to the court because Velez did not relay to Griffin Miner's instruction to perform a custodial arrest.

In sum, on August 12, 2008, Griffin was cited for failure to respond to several radio calls for his assistance; failure to supervise adequately his subordinate with respect to charging the

---

[2] Lieutenant Miner's first name is not included in the record.

- 5 -

drunk and disorderly man; and failure to carry out orders with respect to the man's arrest. In his written response, Griffin claimed that his radio had malfunctioned and was not as loud as a normal radio should have been; that charging a person is a matter of officer discretion; and that he was not responsible for the incomplete paperwork because Miner had instructed Velez, and not him, to finish it. Def. Ex. 20.

Following those two incidents, DMHAS investigated Griffin and decided to terminate his employment. He was informed of his termination by letter dated September 29, 2008, which cited the August 8 and August 12, 2008 incidents as the basis for Griffin's termination,[3] and explained that "it was determined that [Griffin] repeatedly neglected [his] duty by not following proper police protocol regarding police equipment, police arrests, police documentation, police coverage at GBCMHC and in [his] supervisory role." Def. Ex. 31. Griffin's employment ended on October 13, 2008. Griffin unsuccessfully grieved and arbitrated his termination. Griffin separately filed a CHRO complaint alleging discrimination on the basis of race, age, and disability, which the CHRO dismissed. This lawsuit followed.

## II. Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all

---

[3] The letter improperly identifies the August 8 incident as occurring on August 6. Def. Ex. 31.

reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

### III. Discussion

Griffin alleges that he was discriminated against on the basis of his race and that he was retaliated against for filing his CHRO complaint in July 2007, both of which constitute violations of Title VII. Neither claim is tenable on the summary judgment record.

Griffin's claim of race discrimination under Title VII is decided by using the familiar framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Griffin first has an obligation to establish a prima facie case of discrimination. "In the context of an alleged discriminatory discharge, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. County of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010). "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the termination. . . . If defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's termination was his race . . . ." *Id.* at 492 (citation omitted).

Griffin has neither proven a prima facie case of discrimination nor introduced evidence showing that "the real reason" for his termination was his race. DMHAS concedes that Griffin has introduced evidence to meet the first three elements of his prima facie claim: he is African-American; he was qualified to serve as a sergeant in the DMHAS police corps; and his

termination constitutes an adverse employment action. But there is no evidence in the record giving rise to the inference that Griffin was terminated because of his race. Griffin has evidence, arguably, that several of the incidents giving rise to his discipline were overstated. He alleges that the April 11, 2007 correction to the incident report was necessary to reflect the actual time of the incident, and that the failure to press charges for the mental health assistant on May 18, 2007 was not his fault. Pl.'s Statement of Material Facts ¶¶ 7-8. Additionally, Griffin may not have been to blame for failing to send arrest documents to court on August 12, 2008 because he was never given the instruction to do so.

Yet, there are at least four other disciplinary infractions that were reported and detailed in the summary judgment record that Griffin does not contest: (1) on March 29, 2007, Griffin failed to notify DMHAS that two clients went missing; (2) on May 22, 2007, Griffin failed to press charges against a patient for committing assault; (3) on August 8, 2008, Griffin tried to intimidate Sonido into dissuading Sonido's wife from reporting Griffin's misconduct; and (4) on August 12, 2008, Griffin failed to respond to a physical conflict in the GBCMHC reception center and otherwise supervise his subordinate officer. Griffin has not introduced other evidence suggesting that DMHAS discriminated against him, such as proof that similarly situated employees were treated differently. *See Ruiz*, 609 F.3d at 493 ("A showing of disparate treatment — that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group — is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." (quotation omitted)). Griffin's only other evidence supporting his prima facie case is that he was not given adequate training. That evidence, however, is supported by nothing but his own conclusory testimony, *see* Pl. Ex. 2 at 147, which is insufficient to establish a question of fact at summary judgment. *Hicks*

*v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010).

Similarly, even if the court were to assume that Griffin had evidence to support a prima facie case of race discrimination, Griffin has not submitted evidence to rebut DMHAS's lengthy record of Griffin's dereliction and misconduct. Although Griffin has evidence showing that DMHAS may have embellished several of his infractions, he cannot show that his documented history of disciplinary incidents was not a reasonable basis for DMHAS to terminate him.

Griffin's retaliation claim fails for similar reasons. In order to establish a prima facie case of retaliation, Griffin must show "(1) that [he] participated in an activity protected by Title VII, (2) that [his] participation was known to [his] employer, (3) that [his] employer thereafter subjected [him] to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). If Griffin submits evidence sufficient to support a prima facie case, then "the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action. . . . If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action." *Id.* at 552-53 (citation and quotation omitted).

As with his claim of race discrimination, it is conceded that the first three elements of Griffin's prima facie case have been met: he submitted a CHRO complaint in July 2007; DMHAS was aware of the complaint; and Griffin was subject to an adverse employment action when he was terminated. DMHAS argues that the fourth element has not been satisfied because more than a year passed between Griffin's filing of his complaint in July 2007 and his

termination in October 2008. Griffin responds that the correct way to measure the time lapse is from the date of his stipulation with DMHAS in June 2008 until his termination, a period of approximately four months that could establish sufficient proximity to permit a jury to infer that DMHAS retaliated against Griffin. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 555 (2d Cir. 2001) (accepting that four-month lapse could permit a jury to infer retaliation).

Griffin's position is puzzling. If Griffin's argument were accepted, then DMHAS would apparently have retaliated against him for agreeing to settle his CHRO claim, rather than for exercising his rights by complaining to CHRO. That is an irrational and highly unlikely inference for a jury to draw. Indeed, why would DMHAS punish Griffin for *waiving* his rights against the agency? Griffin offers no answer. Nor does Griffin illuminate how Title VII protects an individual against retaliation for electing *not* to exercise his statutory rights.

Even if the court were to assume that Griffin submitted evidence to support a prima facie case, DMHAS is still entitled to summary judgment because there is no evidence rebutting the legitimate reasons for terminating him subsequent to Griffin's stipulation, i.e., the incidents on August 8 and 12, 2008. Those were significant infractions: Griffin attempted to intimidate a subordinate into stopping his wife from reporting Griffin's misconduct, and Griffin failed to assist a fellow officer in subduing a drunk and disorderly man who plainly was a threat to himself and others. Moreover, those infractions occurred after Griffin had been suspended twice and given a final warning. There is no evidence in the record showing that Griffin was treated differently than similarly situated employees or that Griffin's discipline was tied to his CHRO complaint. DMHAS is entitled to summary judgment because Griffin has not put forward a genuine issue of material fact that his termination was based on anything other than legitimate

reasons concerning his disciplinary history.

**IV.     Conclusion**

Griffin has not submitted evidence establishing a genuine issue of material fact with respect to his Title VII claims of race discrimination and retaliation. For the reasons set forth above, summary judgment is awarded to the Connecticut Department of Mental Health and Addiction Services.

The motion for summary judgment (doc. # 26) is GRANTED. The clerk shall close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 13th day of July 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge